UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
EVANSVILLE DIVISION

| | | |
|---|---|---|
| ELLIOTT D. LEVIN, as Chapter 7 Trustee<br>for One Star Long Distance, Inc., | ) | |
| | ) | |
| | ) | |
| Appellant, | ) | |
| | ) | 3:15-cv-00049-RLY-DKL |
| vs. | ) | |
| | ) | |
| VERIZON BUSINESS GLOBAL, LLC,<br>as successor to MCI, Inc., | ) | |
| | ) | |
| | ) | |
| Appellee. | ) | |
| _____ | ) | |
| | ) | |
| IN RE: ONESTAR LONG DISTANCE, INC., | ) | Bankruptcy Case. No. 03-72697 |
| | ) | |
| Debtor. | ) | |
| _____ | ) | |
| | ) | |
| ELLIOTT D. LEVIN, as Chapter 7 Trustee<br>for OneStar Long Distance, Inc., | ) | |
| | ) | |
| | ) | |
| Plaintiff. | ) | |
| | ) | Adversary Proceeding No. |
| vs. | ) | 05-07061 |
| | ) | |
| VERIZON BUSINESS GLOBAL, LLC,<br>as successor to MCI, Inc., | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |

**APPEAL FROM THE UNITED STATES BANKRUPTCY COURT**

On November 24, 2014, the United States Bankruptcy Court for the Southern

District of Indiana held a bench trial in this adversary proceeding over whether the

Trustee for OneStar, Elliott D. Levin, could avoid and recover certain pre-petition

1

transfers that OneStar made to MCI[1], now Verizon Business Global, LLC, during the 90-day Preference Period immediately preceding the filing of OneStar's bankruptcy petition on December 31, 2003.  MCI asserted two defenses which are at issue in this appeal: (1) the "subsequent advance of new value" affirmative defense under 11 U.S.C. § 547(c)(4), and (2) the "ordinary-course-of-business" affirmative defense under 11 U.S.C. § 547(c)(2).  In the Bankruptcy Court's Findings of Fact and Conclusions of Law, the Bankruptcy Court ruled in favor of MCI on its "new value" defense, but ruled against MCI on its "ordinary-course-of-business" defense.  The Trustee appeals the Bankruptcy's Court's ruling in favor of MCI on the "new value" defense; MCI cross-appeals Bankruptcy's Court's rejection of its alternative "ordinary-course-of-business" defense.  Finding no reversible error, the court **AFFIRMS** the Bankruptcy Court's rulings.

## I.    Background

OneStar was a reseller of telecommunications services which it purchased wholesale from suppliers such as MCI, Verizon, and Qwest.  OneStar then resold these services to its customers.  (Joint Pretrial Statement ("JPS"[2]) No. 1).  OneStar was billed by the suppliers and billed its customers in turn.  (JPS No. 2).

OneStar's business relationship with MCI dates back to 1985.  (JPS No. 5).  MCI provided OneStar both switched and unswitched services.  (JPS No. 42).  The unswitched

---

[1] Verizon Business Global, LLC, is the successor to MCI, Inc.  For purposes of this appeal, the court will refer to the appellee simply as MCI.

[2] The court will cite to the undisputed facts set forth in the Joint Pretrial Statement as "JPS No. x".  The court will cite to the disputed facts from the Joint Pretrial Statement as "JPS (party name) No. x".

services were long haul services which leased lines at a fixed charge regardless of usage. Switched services went into the Bell operating switch and terminated calls for OneStar. The charges for unswitched services were billed in arrears or were due as shown on the invoice dates. (JPS No. 42). MCI telecommunication sales, re-sold by OneStar, enabled OneStar to re-sell the same services to OneStar's customers after increasing the price to generate a gross profit. (*See* JPS MCI No. 43; JPS No. 86; Trial Ex. 11, OneStar Long Distance Statement of Operations for 11 Periods Ending 11/30/03 (indicating a gross profit of over $1.6 million in October and over $556,000 in November); Trial Ex. 12, OneStar Long Distance Revenue Statement for Month Ending 12/31/03 (indicating revenue in December in excess of November costs)).

As part of their business relationship, MCI and OneStar entered into a number of Telecommunications Services Agreements, the last of which is dated April 1, 2002. (JPS No. 4; Trial Ex. 16, Telecommunications Services Agreement). Section 21 of the Services Agreement provides that it cannot be assigned by OneStar without the written consent of MCI and that any assignment without such consent shall be void. (Trial Ex. 16 § 21).

On June 30, 2002, OneStar executed a Promissory Note payable to MCI in the original principal sum of $5,907,396.48 for pre-existing unpaid account debt, and a Security Agreement granting MCI a security interest in substantially all of the assets of OneStar. (JPS Nos. 6, 8; Trial Ex. 13, Promissory Note; Trial Ex. 44, Security Agreement). The monthly installments on the Note were $190,615.07. (JPS No. 7). OneStar paid the cumulative sum of $571,845.21 in three monthly installments. (JPS

3

Nos. 13-14).  These checks cleared OneStar's operating account at Old National Bank in October and November 2003.  (JPS No. 15).

MCI issued dozens of monthly invoices for telecommunications service delivered by MCI during the period October 1, 2003 to December 31, 2003, on accounts maintained with OneStar prior to the Preference Period.  (JPS No. 44).  A summary chart prepared by MCI shows that the charges were: (1) $1,294,694.97 for service in October 2003; (2) $1,284,754.57 for service in November 2003; and (3) $1,128,543.14 for service in December 2003.  These charges cumulatively exceed $3.7 million during this period. (JPS MCI No. 47).  The credit for these services is allocated to the month for which service was rendered regardless of when payment was due on the account.  (Trial Ex. 147, Declaration of Natalie Bannister ¶¶ 2, 4 and Ex. 1 attached thereto).

OneStar issued 23 checks as account payments to MCI totaling $1,900,012.81 during that same 90-day period.  (JPS No. 34).  Despite OneStar's payments to MCI, the amount owed on the debt to MCI increased from over $7,500,000 at the beginning of the Preference Period to $9,845,622.52 on December 22, 2003, when MCI assigned the debt to IceNet (discussed below).  (JPS No. 98).  Alan Powers, CEO of OneStar, and Martin Huebschman, CFO and General Counsel of OneStar, both testified that if MCI had terminated sales of such services in October, November, or December of 2003, OneStar could not have continued in business.  (Trial Ex. 1, Deposition of Alan Powers at 79, 171; Trial Ex. 70, Deposition of Martin Huebschman at 102-03).

As a result of OneStar's growing debt and MCI's threats to disconnect service to OneStar, the principals of OneStar formed IceNet, LLC.  (Trial Ex. 14, MCI's Demand

4

Letter dated September 29, 2003; Trial Ex. 15, MCI's Demand Letter dated November 25, 2003; Trial Ex. 70 at 107; *see also* Bankruptcy Court's Finding of Fact No. 60). In December 2003, IceNet and MCI began formal negotiations regarding a transfer of service from OneStar to IceNet. (*See* Trial Ex. 81, Deposition of Thomas Tracey at 86-87; Trial Ex. 125, Deposition of Michael Bass at 11-12; Trial Ex. 70 at 118; *see also* JPS MCI No. 70). These negotiations culminated in the Assignment and Assumption Agreement (the "Assignment"), executed by OneStar, IceNet, and MCI on December 22, 2003. (JPS 56; *see also* Trial Ex. 9, Assignment and Assumption Agreement). Pursuant to the Assignment, OneStar was no longer a party to the Services Agreement; OneStar assigned its contract rights to IceNet, and IceNet assumed OneStar's debt. (JPS MCI No. 84; Trial Ex. 9 §§ 1(c), 1(d), 6(b)). As a result of the Assignment, from December 23 to 31, 2003, MCI sold telecommunications services to IceNet, who then relayed the service from MCI to OneStar. (JPS No. 87). In this capacity, IceNet served as a "middleman" between MCI's delivery of telecommunications services and their ultimate receipt by OneStar. (*Id.*).

On December 31, 2003, an involuntary bankruptcy petition was filed against OneStar under Chapter 7 of Title 11 in the Bankruptcy Court. After the bankruptcy petition was filed, IceNet filed a proof of claim for the debts owed by OneStar to IceNet. (Trial Ex. 80, IceNet Proof of Claim). IceNet asserted no charges for service for the period prior to the Assignment. (*Id.*). Instead, the only claim for usage expressly states that such charges "were incurred after the Bank Assignment was executed." (*Id.*).

In the present adversary proceeding between the Trustee and MCI, the Trustee alleges that the payments made by OneStar to MCI 90 days prior to the involuntary petition date, totaling $2,471,858.02, constitute avoidable transfers pursuant to the provisions of § 547(b) of the Bankruptcy Code.  MCI denied the allegations, and asserted that all of the payments are excepted from avoidance as preferential transfers pursuant to the subsequent advance of new value affirmative defense of 11 U.S.C. § 547(c)(4) and the ordinary-course-of-business affirmative defense of 11 U.S.C. § 547(c)(2).

On July 1, 2013, MCI filed Defendant's Motion for Partial Summary Judgment on New Value to or for the Benefit of the Debtor, and the Trustee filed the Trustee's Motion for Partial Summary Judgment Regarding his Prima Facie Case and MCI, Inc.'s Asserted Subsequent New Value and Ordinary Course of Business Defenses.  On that same date, MCI also filed a Motion for Summary Judgment, arguing that the Note Payments were not subject to avoidance because, *inter alia*, (1) they were payments on a fully secured claim and (2) all payments were excepted from avoidance by the "new value" defense. On March 22, 2013, the Bankruptcy Court issued its Order on Summary Judgment Motions, granting MCI's Motion for Partial Summary Judgment, and denying as moot the Trustee's Motion for Partial Summary Judgment and denying as moot MCI's Motion for Summary Judgment.  On March 28, 2003, the Bankruptcy Court amended its Summary Judgment Order, granting MCI's Motion for Summary Judgment on the "new value" defense and denying as moot the balance of MCI's Motion for Summary Judgment.  The Trustee timely appealed to the district court.

On May 2, 2014, the district court reversed[3] the decision of the Bankruptcy Court, finding there existed a genuine issue of material fact as to whether MCI sold telecommunications services directly to OneStar, rather than IceNet, during the Preference Period until the Assignment was formerly executed on December 22, 2003. On remand, the Bankruptcy Court held a bench trial.  In the Bankruptcy Court's Findings of Fact and Conclusions of Law, it found that there was no sale of telecommunications services by MCI to IceNet prior to the Assignment's execution, and concluded that MCI was entitled to the new value defense as a matter of law.  That determination is the subject of the Trustee's appeal.  The Bankruptcy Court also found that MCI was not entitled to the ordinary-course-of-business defense.  That determination is the subject of MCI's cross-appeal.

All other facts necessary to this appeal will be addressed in the Discussion Section.

## II.    Standard of Review

On appeal, the district court reviews the bankruptcy court's findings of fact for clear error and its legal conclusions *de novo*.  *See Airadigm Commc'ns, Inc. v. Fed. Commc'ns Comm'n*, 547 F.3d 763, 768 (7th Cir. 2008).

---

[3] In the district court's ruling, it agreed with the Bankruptcy Court that OneStar's debt was merely transferred to IceNet as a result of the Assignment and thus remained unpaid as to MCI. This analysis is inconsistent with the district court's finding issues of fact remained as to whether MCI was selling telecommunications services to OneStar during the Preference Period.  The court regrets any confusion this may have caused the Bankruptcy Court and counsel.

### III.    Discussion

A trustee may "avoid" and recover any payments made by the debtor to a creditor for a pre-existing debt "on or within 90 days before the date of the filing of the [bankruptcy] petition."  11 U.S.C. § 547(b).  Section 547(c)(4) of the Bankruptcy Code provides:

> The trustee may not avoid under this section a transfer—
>
> (4)  to or for the benefit of a creditor, to the extent that, after such transfer, such creditor gave new value[4] to or for the benefit of the debtor—
>
> (A)  not secured by an otherwise unavoidable security interest; and
>
> (B)  on account of which new value the debtor did not make an otherwise unavoidable transfer to the creditor.

11 U.S.C. § 547(c)(4).  Thus, the "new value" defense contains three key elements: (1) the creditor must give unsecured new value; (2) this new value must be given after the preferential transfer; and (3) the new value must remain unpaid.  *In re Login Bros. Book Co.*, 294 B.R. 297, 299 (Bankr. N.D. Ill. 2003).

"The reason for requiring that the creditor's subsequent advance be unsecured and unpaid follows from the purpose of the new value defense, which is to recognize that when the recipient of a preferential payment grants a new extension of credit, it 'gives back' the preference to the debtor's estate."  *In re Login Bros. Book Co., Inc.*, 294 B.R. 297, 299 (Bankr. N.D. Ill. 2003) (citing *In re Prescott*, 805 F.2d 719, 731 (7th Cir. 1986)

---

[4] "New value" means, *inter alia*, money or money's worth in goods, services, or new credit.  11 U.S.C. § 547(a)(2).

8

("[T]he theory behind the 'subsequent advance' exception to the trustee's avoiding power is that to the extent unsecured new value is given to the debtor after a preferential transfer is made, the preference is repaid to the bankruptcy estate."))*; see also In re Globe Bldg. Materials, Inc.*, 484 F.3d 946, 950 (7th Cir. 2007) ("In assessing whether a creditor has provided 'new value' to a debtor, courts sometimes ask whether the preference payment being avoided has been 'repaid to the bankruptcy estate,' that is 'whether the new value replenishes the [debtor's] estate.'") (internal citations omitted)); *Kroh Bros. Dev. Co. v. Cont'l Constr. Eng'rs, Inc.*, 930 F.2d 648, 652 (8th Cir. 1991) ("[T]he relevant inquiry under section 547(c)(4) is whether the new value replenishes the estate. If the new value advanced has been paid for by the debtor, the estate is not replenished and the preference unfairly benefits a creditor.").

The Trustee and MCI stipulated that the Trustee established all of the requisite prima facie elements of an avoidable preferential transfer with respect to the Account Payments in the sum of $1,900,012.81. (JPS at p. 5). With that stipulation in mind, the court now turns to whether MCI is entitled to the "new value" defense. This determination turns on whether (1) OneStar's debt to MCI remained "unpaid" and (2) whether MCI gave new value after certain preferential transfers in December 2003.

## A. The New Value Remained Unpaid

In the Seventh Circuit, a creditor who raises the "new value" defense must establish that the debt remained unpaid. *See In re Prescott*, 805 F.2d at 731 ("The creditor that raises a 'subsequent advance' defense has the burden of establishing that new value was extended, which remains unsecured and unpaid after the preferential

transfer.").  The Trustee contends that the Assignment had the effect of satisfying, or repaying, MCI for the new value services and extensions of credit it provided to OneStar during the 90-day Preference Period.  Accordingly, the Trustee argues, the Bankruptcy Court's conclusion that OneStar's debt was merely assigned to IceNet and thus, remained unpaid as to MCI, was erroneous.

As noted in the Background Section, the Assignment was executed by three parties: OneStar, IceNet, and MCI.  In Section 1 of the Assignment, OneStar assigned the Services Agreement with MCI to IceNet.  OneStar acknowledged that, as of the Assignment's effective date, the amount outstanding to MCI, totaling $9,845,622.52, "is fully due and owing."  (Trial Ex. 9 § 1).  Section 1(c) provides that OneStar "agrees to be liable for any obligations, charges, or liabilities with respect to the Accounts arising prior to the Assignment Effective Date."  (*Id*. § 1(c)).  In Section 1(d), OneStar "hereby acknowledged" that the amount outstanding on the Services Obligations and the Note Obligations (the "Outstanding Amount Due") as of the Assignment Effect Date "is fully due and owing" to IceNet without any defenses.  (*Id*. § 1(d); *see also id.* § 6(b) ("OneStar "shall remain liable for any Services Obligations incurred thereunder on or before the Assignment Effective Date.")).

In Section 2(a), MCI assigned all right, title, and interest in the debt owed by OneStar to IceNet.  (*Id*. § 2(a)).  However, in Section 2(c), MCI acknowledged:

> [N]otwithstanding Section 2(a) above, although [MCI] has assigned the Obligations in the amount of the Outstanding Amount Due, [IceNet] only assumed the Assumed Obligations, and except for such Assumed Obligations, IceNet shall not be liable to MCI, irrespective of whether it collects from OneStar on the Outstanding Amount Due or not.

(*Id.* § 2(c)).  Furthermore,

> as contemplated in Section 2(c) above, and in consideration for, *inter alia*, the assignment of the Note, the Security Agreement, and the Services Agreements, [IceNet] assumes ONLY the following obligations of [OneStar] to [MCI] upon the payment terms and conditions set forth in Section 4 (collectively, the "Assumed Obligations"), below:
>
> (1)     the Note Obligations; and
>
> (2)     $1,050,000 (the "Usage Obligations").

(*Id.* § 3(e)).

The terms of the Assignment effectively extinguish OneStar's rights under the Services Agreements with MCI and extinguish its obligation to MCI for the Outstanding Amount Due.  According to the Trustee, because OneStar had no remaining obligations to MCI following the Assignment, the debt to MCI was "paid" or "satisfied."  MCI responds that OneStar's debt remained "unpaid"; it was simply owed to IceNet as assignee rather than MCI.

The evidence establishes that MCI did advance new value in the form of telecommunications services and extensions of credit to OneStar during the Preference Period.  As the Bankruptcy Court observed, MCI advanced more than $3.7 million in new value during the Preference Period while receiving less than $2.5 million in payments.  The debt owed to MCI increased during this period from $7.5 million to almost $9.9 million.  Indeed, OneStar's officers, Mr. Powers and Mr. Huebschman, both testified that OneStar would not have survived without MCI's advances of new value.  The evidence therefore establishes that MCI's new value replenished OneStar's estate.

11

The court further finds that the Assignment did not operate as a preferential transfer in satisfaction of OneStar's substantial unsecured debt ($6.3 million) to MCI. The Bankruptcy Code defines "transfer," in relevant part, as a disposition of the property of the debtor or an interest of the debtor in property.  11 U.S.C. § 101(54).  An assignment falls within the definition of "transfer"; however, OneStar did not transfer any property or an interest in the property of the estate to MCI as a result of the Assignment. As the Bankruptcy Court correctly observed, OneStar's debt was merely assigned to IceNet, who asserted the debt against OneStar in a Proof of Claim in OneStar's bankruptcy case.  Accordingly, the court finds OneStar's debt to MCI remained "unpaid" as of the petition date.

**B.     New Value for December 2003**

Section 547(c)(4) requires that the new value, in the form of goods, services, or new credit, must be provided after the creditor receives the preferential transfer from the debtor.  11 U.S.C. § 547(c)(4) ("The Trustee may not avoid under this section a transfer . . . to the extent that, after such transfer, such creditor gave new value.").  Therefore, in order to qualify as new value, the goods, services, or new credit must be provided *after* the defendant receives the preferential transfer.  The evidence at trial consisted of monthly invoices; however, those invoices do not reflect how much MCI provided to OneStar in terms of telecommunications services on specific dates during the course of the month.  *See* Trial Ex. 118, Deposition of Jennifer Casey, at 16-17 ("The documentary evidence that has been produced is all we have, which are the monthly invoices reflecting sales and per diem allocation of that credit for unsecured –  unsecured extension of credit

12

to OneStar is the basis on which the value of the defense is calculated.").  As a result, the
Trustee argues, MCI failed to prove when in December 2003 the telecommunications
services it asserts constitute new value services were actually provided to OneStar.
Accordingly, the Trustee continues, the Bankruptcy Court erred in finding that MCI gave
new value to OneStar *after* its receipt of $300,000 in account payments from OneStar
dated December 9, 2003 (one check for $100,000) and December 17, 2003 (four checks
totaling $200,000) because the evidence did not support that finding.  (Trial Ex. 147 ¶ 11
and Ex. 5 attached thereto; Trial Ex. 118, Affidavit of Jennifer Casey, Ex. 3).

In calculating MCI's new value defense, the Bankruptcy Court relied upon a chart
reflecting application of new value to each payment the Trustee sought to avoid.  (Trial
Ex. 147, Ex. 5).  The chart, and the underlying analysis to support it, found that in the
case of each payment, new value subsequently advanced by MCI exceeded the payment.
(*Id.* ¶ 11).  Because MCI billed for its services on a monthly basis, and because its bill
included certain fixed "non-usage" charges and other billing which varied based on
"usage," the chart allocated credit for the new value advanced for each month on a *per
diem* basis calculated by the number of days in the month.  (*Id.*, Exs.1, 5).

The Trustee contends the *per diem* allocation of the monthly sum was
inappropriate because MCI did not establish that the amount of telecommunications
services that is the subject of the invoices was uniform on a daily basis throughout the
course of the month.  The case relied upon in support of this proposition, *In re U.S.
Interactive, Inc.*, involves a one-time invoice for services.  321 B.R. 388, 395 (Bankr. D.
Del. 2005).  The Bankruptcy Court held the defendant could not rely on the new value

defense because the defendant failed to prove when the services were performed. *Id.*
"Without establishing that, we cannot determine if the services were performed before or
after the preference payments the Defendant seeks to offset." *Id. In re U.S. Interactive* is
inapplicable to the present case, however, because it does not address new value extended
daily, but billed on a monthly basis.

In the present case, the Bankruptcy Court found use of the *per diem* method
credible to assess MCI's subsequent advances to OneStar for three reasons. First,
$1,128,543.14 of new value was delivered during December 2003 and only $200,000
needed to be advanced in the fourteen remaining days of December following the last
payment. Accordingly, the Bankruptcy Court found "a steeply disproportionate amount
of the new value would need to have been delivered in the first half of the month to affect
the result." (Finding of Fact No. 43). Second, "only a portion of the new value consisted
of usage charges that vary during the month from day to day." (*Id.*). Third, "the monthly
revenues generated by OneStar experienced only a slow decline from $2.4 million in
December 2003 to $2.2 million in January 2004, so there is no evidence of a sudden
decline in new value in the latter half of December 2003." (*Id.*).

In the absence of authority from the Seventh Circuit on this issue, the Bankruptcy
Court relied upon a case from the Northern District of Texas entitled *In re Brook Mays
Music Co.* 418 B.R. 623 (Bankr. N.D. Tex. 2009). There, the Bankruptcy Court used the
*per diem* method where the creditor billed on a monthly basis and it was undisputed that
the creditor did not pay for those services from June 8 to July 11, 2006—a period of 33
days. *Id.* at 629. The Court multiplied the daily rate for new value services provided by

14

the creditor to the debtor and multiplied that number by 33 to determine the subsequent new value attributable to the creditor. *Id.*

Like the creditor in *In re Brook*, MCI billed on a monthly basis. Although the facts in this case reflect payments by OneStar on December 9 and 17, 2003, the court finds the Bankruptcy Court adequately explained, based on the evidence, why the use of the *per diem* method was appropriate based on the facts of this case. Accordingly, the Bankruptcy Court correctly employed the *per diem* method of allocation of new value credit extended by MCI to OneStar for the month of December 2003.

### C.    MCI's Cross-Appeal

MCI cross-appeals the Bankruptcy Court's ruling rejecting its alternative "ordinary-course-of-business" defense. Because the court affirms the Bankruptcy Court's ruling in favor of the "new value" defense, MCI's cross-appeal is **DENIED as MOOT**.

### IV.    Conclusion

For the reasons set forth above, the court **AFFIRMS** the Judgment of the Bankruptcy Court.

**SO ORDERED** this 28th day of March 2016.

_____
RICHARD L. YOUNG, CHIEF JUDGE
United States District Court
Southern District of Indiana

Distributed Electronically to Registered Counsel of Record

15